# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Amy Allene Thorson and Karley Jo Thorson | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| Cristie Cahlin, acting in her individual capacity as a Mahnomen County Child Protection Worker and Julie Hanson, acting in her individual capacity as a Mahnomen County Child Protection Supervisor, | **JURY TRIAL DEMANDED UNDER FRCP 38(b)** |
| Defendants. | |

For their Complaint, Amy Allene Thorson and Karley Jo Thorson ("Plaintiffs"), hereby state and allege as follows:

1.    This is an action for money damages for the harms Plaintiffs Amy and Karley Thorson suffered when Defendants, without a reasonable basis in fact and absent constitutionally adequate procedures, found that Plaintiffs maltreated Amy Thorson's two minor children—Karley Thorson's nephews—by sexual abuse.

2.    Defendants caused Amy to be deprived of care, custody, parenting time, society, and companionship with her three minor children, R.M. (born ▮▮▮▮▮▮, 2015), S.M. (born ▮▮▮▮, 2017), and F.M. (born ▮▮▮▮▮▮, 2020), when Defendants Cristie Cahlin ("Cahlin") and Julie Hanson ("Hanson"), on behalf of Mahnomen County, falsely determined that Plaintiffs sexually abused S.M. and R.M.

3.     As a result of Defendants' false and unsupported child maltreatment finding, Amy was separated from her children, without any communication, for a year and a half, from November 27, 2022, to May 23, 2024.

4.     As a result of Defendants' false and unsupported child maltreatment finding, Karley suffered irreparable harm to her reputation and good standing as a public-school teacher in West Fargo Public School and will continue to suffer from the stigmatization throughout her teaching career.

5.     Defendants' false and unsupported child maltreatment finding against Karley caused her teaching license to be investigated and reviewed in both North Dakota and Minnesota.

6.     Plaintiffs Amy and Karley Thorson were at all times material herein citizens of the United States and residents of North Dakota.

7.     Defendant Cristie Cahlin, a Mahnomen County Child Protection Services (CPS) social worker, was at all times material herein a citizen of the United States, a resident of Minnesota, and acting under color of law in her capacity as a Mahnomen County employee. She is sued in her individual capacity.

8.     Defendant Julie Hanson, a Mahnomen County CPS Supervisor and Social Services Director, was at all times material herein a citizen of the United States, a resident of Minnesota, and acting under color of law in her capacity as a Mahnomen County employee. She is sued in her individual capacity.

9. Defendants Cahlin and Hanson deprived Plaintiffs of an opportunity to be heard and defend themselves at a meaningful time and in a meaningful manner against false child sex abuse accusations.

10. Defendants lacked a reasonable suspicion that Plaintiffs were sexually abusing R.M. and S.M.

11. Defendants knew that Amy and her soon-to-be-ex-husband Scott, the father of the children at issue, were in the midst of a contentious divorce and custody battle, and that Scott has previously lodged unsubstantiated sexual abuse accusations against Plaintiffs.

12. Cahlin already knew Scott; the two grew up in the same town, were high school classmates, and attended the same school since they were children.

13. Despite both Amy and Karley repeatedly reaching out to Cahlin requesting to be interviewed and/or make a statement regarding the false allegations, Cahlin refused to speak to them before entering a finding of child maltreatment by sexual abuse against them.

14. Cahlin knew Minnesota law required her to conduct face-to-face interviews with the alleged perpetrators as part of her investigation, Minn. Stat. § 260E.20, subd. 2(b).

15. Rather than admit she had erred, and violated Minnesota law, by refusing to interview Plaintiffs, Cahlin lied and claimed that Plaintiffs refused to be interviewed. She perpetuated this lie, including under oath during Plaintiffs' appeals, until a Department of Human Services Judge concluded it was fabricated.

16. Cahlin ignored obvious exculpatory evidence, including that S.M. did not disclose *any* abuse during his forensic interview and the obvious reluctance, inconsistencies, and indications of coaching in R.M.'s forensic interview.

17.     Cahlin refused to interview Paulette and Howard Thorson, the children's maternal grandparents in whose house the abuse was alleged to have occurred.

18.     The evidence, the law governing child abuse investigations, and the value of a mother's time with her children all meant nothing to Cahlin. She had predetermined to side with Scott and deliberately ignored anything to the contrary.

19.     When Defendant Julie Hanson had the opportunity to correct Cahlin's errors and reverse the maltreatment findings upon reconsideration, she instead ratified Cahlin's haphazard investigation and affirmed the unsupported findings.

20.     Hanson failed to supervise Cahlin's work as a CPS investigator and perpetuated the same errors at the expense of Amy's right to parent her children and Karley's reputation as a public-school teacher.

21.     Plaintiffs bring their federal claims pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).   The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this action.

22.     A substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in Mahnomen County, Minnesota.  Venue is thus proper in this Court under 28 U.S.C. § 1391(b)(2).

## AMY AND KARLEY THORSON

23.     Plaintiff Amy Thorson was born in 1988 in Fargo, North Dakota.

24.     Plaintiff Karley Thorson, Amy's younger sister, was born in 1992.

4

25.     Amy and Karley grew up in Fargo with their parents, Paulette and Howard Thorson.

26.     Amy and Karley were both dedicated students and high academic achievers.

27.     Karley has always been passionate about working with children and wanted to be a teacher from a young age.

28.     Karley attended Concordia College in Moorehead, Minnesota and double-majored in Elementary Education and Spanish. She graduated with honors in December 2014.

29.     Karley has about ten years of experience as an elementary school teacher. She previously taught in Pierre Public School District in South Dakota and Elk River Public School District in Minnesota.

30.     Karley happily returned to Fargo in summer 2019 to be closer to her family, including her nephews S.M. and R.M., and her niece F.M. who was born in 2020.

31.     Karley began teaching fourth grade at L.E. Berger Elementary in the West Fargo Public School system.

32.     Karley received her master's degree in Reading Education from the University of North Dakota in August 2024.  She hopes to become a reading specialist someday.

33.     Karley's passion for working with children extends beyond the classroom. During college, she was a childcare worker, swim instructor, and lifeguard for the YMCA and Fargo Park District, as well as an overnight camp counselor for Concordia Language Villages.

34.     She is an active volunteer in various children's programs, including Sunday School and Vacation Bible School at Hope Lutheran Church in Fargo.

35.     Karley is an avid volunteer in her local Kiwanis Club, a global organization dedicated to child development and community service.

36.     Karley is well-known for her good character and compassionate heart amongst her family and friends, and in the greater community.

37.     Amy was a talented athlete growing up, competing on the varsity swim, soccer, and softball teams.

38.     After high school, she went to college at Moorhead State University.

39.     Amy graduated with honors in 2011. She earned a Bachelor of Arts degree in psychology, with a double minor in sociology and women's studies.

40.     Amy met Scott McDonough through mutual friends. They began dating around 2013.

41.     Amy and Scott had their first son, R.M., on ███████, 2015. Their son S.M. was born on ██████, 2017.

42.     Amy decided to stay at home with the boys and parent full-time after S.M. was born.

43.     Amy and Scott got married on March 10, 2018.

44.     Also in 2018, Amy went back to school for her master's degree. She was interested in working with people suffering from substance abuse and addiction issues.

45.     She started a Master of Science in addiction and mental health services and studies at the University of Mary.

46.     Amy's and Scott's daughter, F.M., was born on ███████, 2020.

47.     Although attending school and completing her master's work while pregnant and parenting was grueling, Amy graduated from the University of Mary in May 2020.

48.     Unfortunately, Amy and Scott's relationship was deteriorating by this point.

49.     They began fighting more frequently while Amy was still pregnant with F.M. in 2019 and 2020.

50.     The isolation of the COVID-19 pandemic quarantine took a toll on their relationship. Amy found that she had little in common with Scott and felt very isolated.

51.     Sadly, Amy was also struggling with substance abuse and her mental health.

52.     Amy had ups and downs in her battle with substance abuse throughout her adult life.

53.     She turned to alcohol to cope with the isolation of the pandemic, the deterioration of her marriage, her struggles with mental health, and a serious injury to her arm.

54.     Rather than support her, Scott used Amy's substance abuse against her. Scott would call the police and child protective services to report her for drinking and demand the police come conduct welfare checks.

55.     Scott became verbally abusive to Amy.

56.     As one example, a video Karley recorded in November 2020 depicts Scott yelling at Amy and using the word "fuck" repeatedly in front of the children, including calling Amy a "fucking pedophile."

57.     Amy felt like Scott was constantly putting her down and picking on her, which only aggravated her substance abuse struggles.

58.     Despite the struggles she was facing at home, Amy obtained a job at Churches United—a non-profit serving the homeless community—as a shelter advocate. Amy found fulfillment in working with people in need.

59.     Amy worked at night so that she could parent during the day while Scott was working.

60.     Karley has always been incredibly close to her niece and nephews. Amy describes Karley as a second mom to her kids.

61.     As a teacher, Karley was able to assist Amy with childcare in the summers and help R.M. and S.M. with their homework and tutoring assistance to help the boys excel in school.

62.     Karley was particularly helpful when Amy began working nights at Churches United.

63.     Karley often took the children to activities, like swimming, soccer, and tee-ball games. She also volunteered in her nephews' Sunday School small group at Hope Lutheran Church.

64.     Scott did not pay, and rarely thanked, Karley for her extensive assistance with childcare. Instead, he would just disappear when the kids were in Karley's care.

65.     Rather than be grateful for the positive influence Karley has on his children's lives, Scott felt threatened by Karley's relationship with his children.

66.     Scott and Amy separated around January 2022.

67.     Scott moved to Waubun, Minnesota shortly after they separated. Scott left his children in the care of Amy and her family.

68.     Amy focused on getting sober. She participated in an intensive partial-hospitalization treatment program at Prairie St. John's in Fargo in January- February 2022 and August 2022.

69.     The deterioration of her marriage and contested divorce placed an immense hardship on Amy.  Karley was a source of comfort and stability for the children.

70.     Karley supported Amy's sobriety and attended Alcoholics Anonymous (AA) meetings with her.

71.     Karley does not drink alcohol and maintains an active lifestyle. She especially enjoys running and swimming.

72.     She encouraged Amy to join the YMCA with her to stay active, which had always been a source of strength and comfort for Amy.

73.     With her family's love and support, Amy has achieved almost two years of sobriety.

## SCOTT MCDONOUGH'S CAMPAIGN OF FALSE ALLEGATIONS AGAINST AMY & KARLEY THORSON

74.     Scott and Amy filed for divorce in April 2022.

75.     They had a contentious divorce, and Scott remained extremely hostile towards the Thorson family.

76.     Although Scott had primary custody of the children on an interim basis beginning in August 2022, Amy retained visitation rights.

77.     But Scott was determined to sabotage Amy's relationship with her children. He frequently denied or withheld visitation and phone calls from Amy.

78.     He would threaten to move the children to the White Earth Indian Reservation to keep them away from Amy.

79.     Scott was verbally abusive to Amy, Karley, and their parents.

80.     He abused and weaponized child protective services and the police against Amy to gain an upper hand in their custody battle and damage her relationship with their children—a common tactic that is ordinarily thwarted by a CPS investigation compliant with Minnesota state law and helmed by an objective lead investigator.

81.     Similarly, Scott threatened to report Karley for child abuse to the school board so that she would lose her employment as a public-school teacher.

82.     On March 12, 2022, Scott called the Fargo Police Department and claimed Amy was over at the neighbors' house, intoxicated, and not watching the kids.

83.     As the police confirmed when they spoke to Amy, she was at her parents' house with the kids and had just gotten home from work. Amy had not been drinking, and the police confirmed she did not sound intoxicated or impaired.

84.     The Fargo police concluded there was "[n]o reason to be concerned for the children's welfare at this time."

85.     Around the same time, Scott falsely reported to Child Protection Services of Cass County, North Dakota that Amy choked and sexually touched S.M.

86.     Scott hurled a host of wild and unsupported accusations to see what might stick.

87.     He falsely claimed Amy was known to choke, hit, and throw the children.  He repeated his debunked claim that Amy left the children home alone to drink at the neighbors' house.

88.     He even claimed that Amy tried to stab one of the children, though he conceded he never involved the police at the time of the incident.

89.     A Cass County CPS social worker, Mavis Brown, and Sergeant Junell Krabbenhoft and Investigator Alice Thielges of Fargo PD investigated Scott's allegations.

90.     Mavis Brown completed an unannounced home visit, during which neither R.M. nor S.M. disclosed any abuse or neglect.  All three children looked healthy and appeared well.

91.     Both Amy and Howard Thorson told Ms. Brown that Scott's allegations about the safety of the children were false and vindictive.

92.     Amy also confirmed she had completed treatment for alcohol use and mental health.

93.     Scott told Investigator Thielges he suspected Amy was abusing R.M. and S.M. because  the children were making sexual gestures and comments which kids their age shouldn't know.

94.     Obviously, kids learn sexual language and gestures from a variety of places—school, friends, the media, the internet, and older siblings.

95.     Once, around April 2020, S.M. claimed that Scott's older son from a previous relationship touched his "wiener."

96.     After the boys explained that they were using the word "wiener" to refer to something besides male genitalia while they were wrestling and playing together, Scott and Amy concluded it was a misunderstanding.

97.     Consequently, Scott knew that S.M. and R.M. were exposed to sexual language in his own home, and it was not an indication that Amy was sexually abusing the children.

98.     Scott also slandered Karley during his conversation with Investigator Thielges, telling her that Karley is "very weird" and that he believes there is something going on between Amy, her sister, and the kids but that he can't prove anything.

99.     He called the Thorson family a "cult."

100.    Scott also claimed to have an audio recording of Amy during a Facetime call with Scott's family proving Amy choked, slapped, and touched S.M. inappropriately.

101.    Although Scott claimed his sister and mother could corroborate what happened on the call, the number Scott gave for his own mother was not a working phone and sister's phone just rang and rang with no voicemail.

102.    Scott never came to the police station to play the alleged recording, despite offering to do so over the phone. And he never uploaded the video to the link provided by Fargo PD.

103.    Clearly, the phantom audio recording never existed. Just like the rest of his allegations, it was entirely fabricated.

104.    Ultimately, Cass County CPS and Fargo PD determined "[t]here is no evidence at this time to substantiate Scott's allegations" and closed the matter. On April 25, 2022, Investigator Thielges marked the case as inactive.

105.    On May 9, 2022, Cass County Human Services sent Amy a notice that the CPS investigation was being "Terminated in Progress" because "there is no credible evidence supporting the reported abuse or neglect" Scott alleged.

106.    Scott texted Amy on March 24, 2022, in the midst of the investigation: "Best be keeping your nose clean because CPS is up your ass again.  I provided them with everything this time, so you know it's me."

107.    Scott and his girlfriend repeatedly texted and messaged Amy on social media, sometimes on burner accounts, calling her a "child molester" and "child abuser."

108.    In May 2022, Amy reported to the Fargo PD that she was getting calls and messages from different accounts and numbers threatening to report her for "child molestation."

109.    On May 10, 2022—just a day after his previous false report was closed—Scott once again falsely reported to the Fargo Police Department that Amy was drinking around the children and demanded a welfare check.

110.    Once again, an officer came to Amy's house, spoke to her, and concluded she did not appear intoxicated at all.  The kids were safely in bed.

111.    When the Fargo Police called to report this finding to Scott, he merely wielded new false accusations that Amy had assaulted two-year-old F.M. and "was making sexual advances towards the other kids."

112.    Having no success with investigating agencies in Cass County, North Dakota, Scott turned his sights to a new target for his lies: Mahnomen County, Minnesota.

113.    Consistent with his history of threatening and verbally abusive behavior, and false and defamatory reports regarding Amy and her family, Scott made another false report of child sexual abuse on August 15, 2022—this time to Defendants Cristie Cahlin and Julie Hanson with Mahnomen County.

## MAHNOMEN COUNTY AND DEFENDANT CRISTIE CAHLIN INVESTIGATE SCOTT'S FALSE CHILD SEX ABUSE ALLEGATIONS

114.    Although Scott's Mahnomen County allegations—like the multiple previous reports before it—were entirely fabricated, he finally found an audience in his schoolmate Cahlin.

115.    Mahnomen County rehired Cahlin as a Child Protection Investigator in 2021.

116.    Previously, Cahlin worked in the Child Support Services for Becker County from June 13, 2016, to April 20, 2021.

117.    Becker County fired Cahlin for gross and willful misconduct in April 2021.

118.    As outlined in her termination letter, Cahlin was absent without approved leave (AWOL) for days and insubordinate.

119.    She went on a vacation after being told she was not approved to do so and despite not having accrued sufficient time off, failed or refused to respond to emails from her supervisor, and missed a child protection visit and a court appearance.

120.    Cahlin's termination from Becker County is emblematic of her utter disregard for the administrative rules and guidelines that ensure the child protection system is run fairly and impartially.

121.    On August 15, 2022, Cahlin reached out to Scott regarding a report made to Mahnomen County that he was neglecting or abusing his children.

122.    Despite Cahlin knowing Scott since childhood—the two were the same grade level and attended school together from a young age through high school—Cahlin did not recuse herself based on the clear conflict of interest.

14

123.    When initially questioned by Cahlin, Scott deflected attention from himself by accusing Amy and Karley of sexually abusing S.M. and R.M.

124.    The reactionary nature of this accusation alone raises a red flag. Yet, Cahlin just shifted her focus from Scott to Amy and Karley.

125.    Cahlin interviewed Amy on September 1, 2022, and Amy denied that she or anyone in the Thorson family sexually abused her children.

126.    On September 12, 2022, a social worker from the Red River Child Advocacy Center in Fargo, North Dakota interviewed S.M. and R.M as part of the investigation. The children made no allegations of sexual abuse.

127.    Disturbingly, Scott sent Amy a photo of himself in the room with S.M. during S.M.'s interview at Red River Child Advocacy Center, telling Amy she would be in trouble soon.

128.    As Scott's text message implied, he was manipulating and coaching his kids to accuse Amy and Karley of sexual abuse.

129.    Although neither S.M. nor R.M. disclosed any sexual abuse in this interview, Scott lied to Amy and claimed the boys shared that they were physically and sexually abused. Scott falsely claimed the kids "ratted out" the Thorsons to CPS.

130.    The next weekend, Scott refused to comply with Amy's court-ordered visitation rights. He did not show up to drop the children at the Fargo police station, where Paulette usually picked them up for visitation.

131.    He cut off communication between Amy and her children.

15

132.   Paulette Thorson wrote an email and a letter to Cahlin describing the family's concerns with Scott's behavior, and his history of spreading lies to CPS.

133.   Paulette told Cahlin in the letter that Scott was "doing everything possible for Amy not to have a relationship with her children."

134.   In her email, Paulette reported that S.M. told the Thorsons, "my dad said your [sic] bad people."

135.   S.M. also told the Thorsons that his dad keeps telling him that Karley "stuck her hands in my pants, and I tell him she didn't."

136.   Cahlin responded that she would take Paulette's information into consideration and asked her to reach out if there was anything else to make Cahlin aware of.

137.   Paulette's warning was a glaring red flag that Scott was manipulating his children and weaponizing Mahnomen County CPS against Amy and Karley.

138.   Scott continued harassing Plaintiffs while the investigation was pending.

139.   In August 2022, Scott and his girlfriend yelled at Karley in front of the children while picking them up from Amy's house, calling her a "child molester." The girlfriend threatened to leave fliers all over Karley's school telling everyone she was a child molester.

140.   Scott texted Amy in September calling her a "crackhead, alcoholic who abused" her children and a "meth head."

141.   As confirmed by a September 30, 2022, laboratory test, Amy was clean and sober.

142.   On October 8, 2022, Scott texted Amy "[y]ou ain't getting the kids, file your motion cunt."   Followed by "[f]uck your calls, fuck your visitation, I've had

enough[.] I'll be glad to disclose what you did to our kids to a judge you sick fuck you're a fucking idiot."

143.    Similarly, he wrote to Amy that "you endangered minor children, now the state and county are involved.  They're not going to give you the kids."

144.    As aforementioned, the children disclosed no abuse during their interviews.

145.    On October 12, 2022, Amy spoke to Cahlin again, who confirmed that there was no evidence of Scott's allegations against her.

146.    On October 31, 2022, Mahnomen County Child Services sent a determination letter, signed by Cahlin, stating that the allegations were not substantiated and closing the case.

147.    The allegations were not substantiated because they were false.  Amy and Karley have never physically or sexually abused S.M. and R.M.

## CHRISTIE CAHLIN ENTERS FALSE CHILD MALTREATMENT FINDINGS AGAINST PLAINTIFFS FOLLOWING A SECOND MAHNOMEN COUNTY CPS REPORT

148.    Still, Scott was undeterred. He continued his campaign of harassment and false accusations against Amy and Karley.

149.    He also continued withholding Amy's court-ordered visitation and phone calls. The last time Amy, Karley, or any of their family members visited or cared for the children was November 27, 2022.

150.    On November 30, 2022, Scott took a screenshot from one of Amy's Facetime calls with R.M. and S.M. and overlaid text on the photo to create a meme stating: "The Look You Give When You Got Your Meth Fix And Not Your Kids."

151.    Amy was maintaining her sobriety, as confirmed by her hair follicle testing.

152.    Scott was also determined to take another bite at the Mahnomen County CPS apple.

153.    He manipulated not only the legal system, but his own children, too, as part of his vendetta against Amy and Karley.

154.    Scott coached and encouraged S.M. and R.M. to say that their mother and aunt sexually abused them.

155.    Scott and his girlfriend repeatedly accused Amy and Karley of being "child molesters" and "pedophiles" in front of the children.

156.    The last time Amy spoke to her children on the phone was December 7, 2022, while they were in Scott's care.  On this call, Scott taunted Amy and told her she was about the get in a lot of trouble from the children's therapist.

157.    Just as Scott warned, on December 13, 2022, S.M.'s school therapist reported to Mahnomen County CPS that S.M. disclosed that his mom and Karley "suck on his dick every time he goes there."

158.    While Mahnomen County must, and should, investigate every report, several red flags were immediately recognizable about this report, but ultimately ignored.

159.    Perhaps most glaringly, Scott—who was in a custody battle with his ex-wife—had made strikingly similar accusations just six weeks before that were totally unsubstantiated.

160.    S.M.'s reported language, namely, that his mother and aunt "suck on his dick," is adult language indicative of coaching rather than a genuine report of sex abuse.

161.    Relatedly, as CPS investigators and supervisors, Defendants Cahlin and Hanson were aware of how extremely rare it would be to have two related, female co-perpetrators performing oral sex, together, on a family member.

162.    Defendants, as CPS investigators, must rely on their knowledge and experience to evaluate the veracity of allegations.  Yet, Defendants' investigation probed none of these obvious concerns.

163.    On December 14, 2022, Cahlin called Amy to inform her that there was a new investigation.

164.    Amy was upset. Scott had been harassing her, interfering with her visitation, and falsely reporting her for child abuse for months on end and to multiple agencies.

165.    Amy was frustrated by the latest round of accusations and lost her temper.  She cursed and hung up the phone.

166.    When she regained her composure shortly after the first call, she quickly called Cahlin back and apologized.

167.    Cahlin told Amy that there would be an assessment and advised Amy that she would interview her as part of the investigation.  Amy indicated that this could be arranged through her attorney.

168.    Based on this conversation, Amy reasonably believed Cahlin would reach out to her attorney to schedule an interview sometime soon.

169.    Despite her commitment to do so, Cahlin made no attempt to interview Amy.

170.    Amy's attorney contacted Cahlin to schedule Amy's interview, to no avail. Cahlin simply informed her that she did not need to speak with Amy before reaching a

determination on the maltreatment allegations, and that the Amy's statement would not change her findings.

171.   Karley first heard about the new set of allegations from Amy.

172.   On December 14, 2022, Karley called Defendant Cahlin to discuss the report.  Karley indicated that the allegations are serious, especially since she is a teacher.

173.   Karley told Cahlin she was "sick of Scott harassing" their family.

174.   Cahlin did not attempt to interview her, but assured Karley she would reach out to schedule an interview later.

175.   Karley never withdrew her request to be interviewed.  Yet, Cahlin never reached back out to schedule one before reaching her determination.

176.   Cahlin also spoke to Scott on the phone on December 14, 2022.  Scott told Cahlin he would prefer if the boys' forensic interviews took place in Mahnomen because they "felt a little intimidated at the [Red River Child Advocacy Center] last time."

177.   As Cahlin knew, the boys did not disclose abuse or neglect during their interviews at the Red River CAC.

178.   Scott was adjusting tactics after his previous attempt to smear Plaintiffs failed.  His attempt to direct the investigation should have been immediately concerning to Cahlin.

179.   According to Cahlin's own notes, "Scott talked a lot about the divorce and how that is going."  Consequently, Cahlin was aware that Scott and Amy were in the throes of a tumultuous divorce and custody battle.

180.     Cahlin told Scott that she intended to conduct a face-to-face interview with him the next day.

181.     That same day, Howard Thorson called and left a voicemail for Cahlin requesting to give a statement about the allegations.  Cahlin never returned Howard's call.

182.     Also on December 14, 2022, Cahlin put a safety plan into effect recommending no contact—in-person or via phone or video call—between S.M., R.M., and F.M. and *any* of the maternal side of the family, including Amy, Karley, Paulette, and/or Howard, until she or another Mahnomen County CPS social worker deemed it appropriate.

183.     In other words, Cahlin cut off Plaintiffs completely from the children, *indefinitely.*

184.     On December 16, 2022, Cahlin noted in the Mahnomen County case management system that she was texting with Scott throughout the day.  Cahlin never texted with Amy or Karley at any point during the investigation.

185.     Cahlin conducted a school visit on December 16, 2022, where she spoke to R.M. and S.M together.

186.     Cahlin noted that the children disclosed that "[s]ometimes dad is mean – angry, yells at dogs – sometimes they get spanked when they are naughty."

187.     She also noted that the boys are sad mom and dad are not together anymore.

188.     Cahlin wrote that "[s]ometimes they feel unsafe when touching private dicks and butts," at which point S.M. laughed and told R.M. not to say dicks and butts.

189.     When Cahlin asked, R.M. said mom and Aunt Karley touch their dicks and butts.

190.     R.M. said he did not want to see mom and Karley anymore.  S.M. said he did.

191.    R.M. and S.M. shut down, and R.M. reverted to baby talk.  Cahlin could not refocus them, and no further disclosures were made.

192.    Notably, S.M. made no disclosures and laughed at R.M. using the words "dick" and "butt," indicating this was not their typical vocabulary.

193.    Cahlin did not record or transcribe this interview.

194.    On December 20, 2022, having heard nothing from Cahlin in nearly a week, Karley again reached out to Cahlin through her attorney, requesting to schedule an interview.

195.    Her attorney asked when Cahlin would like to meet and offered to host at his office.

196.    On December 21, 2022, Defendant Cahlin responded: "I will touch base with you after the children are formally interviewed to scheduled [sic] something with Karley."

197.    Cahlin did not inform Karley's attorney that the forensic interviews were scheduled for the next day (although she did inform Scott on December 19th).

198.    Karley's attorney provided appropriate releases to receive information about the investigation and facilitate an interview with his client.

199.    Cahlin did not reach out to Karley, nor her attorney, again until she informed Plaintiffs that she made a determination against them.

200.    On December 22, 2022, S.M. and R.M. were forensically interviewed by Jessica Reed, a Mahnomen County CPS supervisor, at the Naytahwaush Child Advocacy Center in White Earth, Minnesota.

201.    Scott, the accuser, brought the children to the interviews.

202.    Reed interviewed S.M., who was five years old and in kindergarten at the time.

203.    From the start, S.M. exhibited signs that Scott had coached him before the interview.

204.    Upon introducing herself, S.M. immediately told Reed he knew her name was going to be Jessica and that he was there to talk about what happened at his grandma's (Paulette Thorson) house.

205.    But when Reed asked what happened at grandma's house, S.M. responded "I forget."

206.    He did not respond when Reed asked whether it was something he did or didn't like.

207.    S.M. fluctuated between saying his last visit to his mom's house was "bad" and that it was "kinda good," but refused to elaborate on either answer.

208.    S.M. spent most of his forensic interview drawing and talking to Reed about his different drawings.

209.    At one point, S.M. walked out of the room and Reed had to coax him back in after about four minutes.

210.    Reed attempted to redirect S.M. by asking what a "bad visit" at his mom's house looks like, but S.M. said "the visit was kinda good."

211.    Reed changed the topic and told S.M. she wanted to "talk about touches you like and touches you don't like."  To which S.M. stated he does not like when someone touches his private parts.

212.     When Reed asked about the last time someone touched S.M.'s private parts, he did not name anyone.

213.     After talking about his drawings again, Reed asked S.M. again what happened at his mom's house, and S.M. responded "mmm…I don't know."

214.     Towards the end of the interview, Reed tried to redirect S.M. again by asking him to tell her about when someone touched his private parts and he didn't like it, but S.M. said "no."

215.     S.M. walked out of the interview shortly after.

216.     S.M. did not report or disclose *any* physical or sexual abuse or inappropriate touching by Amy, Karley, or anyone else.

217.     Next, Reed interviewed R.M., who was seven years old and in second grade at the time of the interview.

218.     When Reed asked what Scott told R.M. about coming for his forensic interview, R.M. said he forgot.

219.     When asked about touches he likes, R.M. said he likes to be tickled and hold hands.

220.     When asked about touches he doesn't like, R.M. said "in the wiener."

221.     Reed asked him to tell her about the last time someone touched him in the wiener and he didn't like it. R.M. said "um mommy and auntie."

222.     Reed asked when this last happened, and R.M. said "I forgot." R.M. said it happened in their house, downstairs where his bedroom is.

223.    Reed asked what happened first, and R.M. said "they touched my wiener and then touched my butt" and that he "was wearing nothing."

224.    R.M. stated that his mom and "Auntie Karley" were the only people in the room when this happened.

225.    Reed asked what happened after they touched his butt, and R.M. stated "nothing else."

226.    Reed asked R.M. to tell her about what he meant when R.M. said he felt uncomfortable, to which he responded "Mmm I forgot."

227.    R.M. stated that he was seven, his current age, when this happened.

228.    Reed asked what happened next when his mom and Auntie Karley touched his wiener, and R.M. repeated "then they touched my butt." He claimed "they said nothing" when this happened.

229.    Reed asked about the first time it happened. R.M. said it was on a Sunday because he only went to mom's house on Saturdays and Sundays.

230.    Reed asked R.M. to tell her about the first time it happened. R.M. said – "okay…it was on…it was on on November or the first day of November umm it was…November the first day of Saturday."

231.    Reed asked R.M. to tell her about the worst time mommy or Karley touched his wiener.

232.    R.M. said "the last time." When Reed asked what made it the worst, R.M. said "I actually forgot."

233.    Reed asked what mommy and Auntie Karley use to touch his wiener, and R.M. responded "their hands."

234.    Reed asked R.M. about a time he was afraid.  R.M. said he has "been afraid with my big brother…he always attacks me…."  R.M. added that his older brother is a lot stronger than him.

235.    When Reed pressed for more details on the alleged sexual abuse by his mom and aunt, R.M. claimed that they go in his bed and do "the sucking dick thing."

236.    When Reed asked R.M. to tell her more, R.M. responded "uh I forgot…I mean they use their hands to do it."

237.    Reed asked whether he had underwear on.  Whereas R.M. had previously said and confirmed he was wearing nothing, and his clothes were on the floor, R.M. now said he had underwear on when this happened.

238.    R.M. said Plaintiffs touch him on top of his underwear.

239.    While R.M.—unlike S.M.—disclosed abuse during his forensic interview, Reed's interview revealed several flagrant issues that Cahlin, as a CPS investigator, should have recognized and explored further during her investigation.

240.    As Reed noted in her evaluation of the interviews, R.M. "would not make eye contact, did not stay on track regarding the 'touching,' became more antsy-unable to sit still in the chair" when discussing the purported abuse.

241.    R.M. stated that he "forgets" or "forgot" in response to several of Reed's questions about the abuse.

242.    R.M.'s descriptions of the abuse contained several inconsistencies, including the dates of the abuse, the description of the abuse, whether he was clothed, and whether Plaintiffs supposedly touched him above or below his clothing.

243.    R.M. stated he was wearing nothing and, later, that he threw his clothes on the floor. But then changed his mind and said he was wearing underwear and Plaintiffs supposedly touched him over his underwear.

244.    R.M.'s use of adult language like "sucking dick thing" indicates that he was coached to use adult language that was not in his natural vocabulary.

245.    Indeed, R.M.'s use of the phrase "sucking dick" was nonsensical in context, since R.M. said Plaintiffs use their hands and touched him over his underwear.

246.    R.M.'s timeline was laden with signs of coaching and manipulation from Scott.

247.    R.M. claimed that the first occurrence of the abuse was a Sunday and then immediately after that it was on a Saturday.

248.    As Defendants should have been aware from their investigation, the children were not with the Plaintiffs or at the Thorson's house on the first day of November or the first Saturday of November—when R.M. said the abuse happened for the first time.

249.    Regardless of the exact date, R.M. claimed that the *first* occurrence of the abuse was sometime in November 2022.

250.    This alone should have been incredibly disconcerting to Defendants, since (as Defendants were aware), Scott had accused Plaintiffs of sexually abusing the boys in August 2022, *months* before R.M. claimed he was first abused.

251.     In fact, Scott had been accusing Plaintiffs of sexually abusing the children and falsely reporting physical and sexual abuse for *years* before R.M. stated the sexual abuse began.

252.     Yet, neither Cahlin nor Hanson made any mention of the glaring issues with Reed's forensic interview in the investigation or final determination.

253.     No one reached out to Plaintiffs to discuss the forensic interviews of S.M. and R.M., nor the disclosures made by R.M.

254.     Indeed, Cahlin did no further investigation before entering her maltreatment findings, despite S.M. never reporting *any* abuse and the glaring issues with R.M.'s disclosures.

255.     Cahlin's unquestioned reliance on R.M.'s disclosures as the basis of her child sex abuse finding was unreasonable and violated professional norms of CPS investigations.

256.     On December 29, 2022, Mahnomen County sent Plaintiffs separate notices that Defendant Cahlin had determined by a preponderance of the evidence that they had sexually abused S.M. and R.M.

257.     The letter contained blatantly false information.  Cahlin wrote that the "reasons for this decision is based on the disclosures made by both [S.M.] and [R.M.] to multiple persons, including but not limited to a forensic interviewer."  As Cahlin knew, S.M. never made any disclosures during his forensic interview nor during her unrecorded interview at the school.

258.    Plaintiffs were shocked.  Cahlin had afforded them almost no information about the allegations against them and no opportunity to address them, let alone rebut them.

259.    Cahlin had until January 27, 2023, to complete her investigation.   Yet, inexplicably, Cahlin entered her maltreatment findings just 16 days after receiving the report.

260.    Cahlin trampled Plaintiffs' rights in her rush to judgment.  She declined to use her ample time to interview Plaintiffs and the children's grandparents, explore inconsistencies, and collect additional available evidence.

261.    Cahlin made no attempt to interview or take statements from Amy and Karley—the subjects of her investigation – before making her determination.

262.    On December 30, 2022, Cahlin emailed Amy that she had "an update regarding the outcomes of the forensic interviews" and asked if she'd prefer a call or an email.

263.    Amy responded within 30 minutes to provide the contact information for her attorney and proactively requested a release to authorize Cahlin to speak with her attorney.

264.    As this brief exchange shows, Cahlin had Amy's contact information, and Amy was always ready and willing to assist in the investigation.

265.    Amy had been waiting for Cahlin, the CPS investigator, to reach out about the case and schedule an interview, as Cahlin indicated she would during their initial call.

266.    But Cahlin simply entered her maltreatment finding without speaking to Amy.

267.    The same day, Cahlin notified Karley's attorney via email that she had reached a determination in the case.

268.    Karley's attorney responded right away and reiterated that Karley would like to speak to Cahlin and provide information about the case.

269.    It was too late.  Cahlin responded that she had already sent out the determination letters.  She admitted that she "typically interview[s] clients and ask[s] about the allegations."

270.    While such interviews are required in every case, Cahlin's failure to conduct them here is particularly egregious given the severity of the alleged conduct, Cahlin's relationship to and on-going communication with Scott, the obvious credibility issues regarding Scott's prior false accusations, the antagonism between Scott and the Plaintiffs, and the threadbare evidence that any sexual abuse occurred.

271.    Cahlin offered no excuse for her failure to conduct interviews.  She simply stated: "If [Karley] wishes to speak to me, let me know.  **The determination stands regardless**." (emphasis added).

272.    Nothing Karley and Amy had to say could change her mind.  Cahlin had already entered her devastating finding that Amy and Karley sexually abused S.M. and R.M.

273.    By refusing to interview them, Cahlin denied Amy and Karley the opportunity to provide crucial testimony and evidence to challenge the accusations against them.

274.    As demonstrated by the plethora of exhibits Plaintiffs submitted in conjunction with their successful appeals of Cahlin's maltreatment findings, Amy and Karley had significant evidence regarding Scott's pattern of falsely accusing them of child abuse, including sex abuse.

275.    Cahlin ignored vital information that undermined Scott's allegations.

276.   Cahlin knew that Scott had accused Amy and Karley of sexual abuse just a few weeks before and that neither child had disclosed abuse at that time.  Cahlin herself determined that those allegations were unsubstantiated.

277.   Cahlin had received information from Paulette Thorson in conjunction with Scott's previous allegations describing the contentious relationship between Scott and the Thorsons.

278.   Paulette's email described Scott planting sex abuse accusations in S.M.'s mind.

279.   Scott told Cahlin about his contentious and ongoing divorce proceedings with Amy.

280.   Cahlin appeared in a custody hearing in Cass County relating to Amy and Scott's custody battle on December 21, 2022, in the midst of this investigation.

281.   Given the relationship between the accuser and the accused, affording the Plaintiffs an opportunity to be heard was particularly important.

282.   Instead, Cahlin communicated almost exclusively with Scott—her former classmate—and ignored Amy and Karley.

283.   In addition to refusing to interview Amy and Karley, Cahlin did not speak with Paulette and Howard Thorson, in whose house the abuse was alleged to take place.

284.   She never returned Howard's phone call.

285.   Cahlin was aware Karley was an elementary school teacher.

286.   Given Karley's lengthy resume of work and volunteer experience with children, Cahlin had no shortage of options to test Scott's child abuse accusations.  Indeed, Karley

submitted an abundance of character letters from employers, neighbors, friends, co-volunteers, and pastors as part of her appeal.

287.    In all of Karley's extensive work with children, no one had ever accused her of physical or sexual abuse or misconduct before Scott began his vicious and false smear campaign against the Plaintiffs.

288.    Cahlin, however, spoke to no one—not even Karley—about her extensive experience in education and childcare before making her determination.

## CRISTIE CAHLIN'S INVESTIGATION VIOLATED STATE LAW

289.    Minnesota law, Minn. Stat. § 260E, *et. seq.*, governs the process to be observed in conducting a child abuse investigation.

290.    Defendant Cahlin disregarded the procedures required by state law when she prematurely entered maltreatment findings against Plaintiffs without interviewing them, collecting available and relevant information to make an accurate determination, and providing them adequate notice of the allegations against them.

291.    Minn. Stat. § 260E.20, subd. 2(b) provides that "the local welfare agency *shall* [] conduct a face-to-face interview with the alleged offender in the early stages of the assessment or investigation." (emphasis added).

292.    Similarly, Minn. Stat. § 260E.20, subd. 2(d) provides that the local agency "*must* provide the alleged offender with an opportunity to make a statement." (emphasis added).

293.    Despite this clear statutory import, neither Cahlin, nor any other Mahnomen County CPS employee or supervisor, conducted a face-to-face interview

of Plaintiffs or provided them an opportunity to make a statement before entering a maltreatment finding against them.

294.    Both Plaintiffs, through counsel, expressed their desire to be interviewed and give a statement, which Defendants expressly denied them.

295.    To cover up her mishandling of the investigation and violations of state law, Cahlin later lied and said Plaintiffs refused or declined to be interviewed.

296.    Minn. Stat. § 260E.20, subd. 2(c) provides that "[a]t the initial contact with the alleged offender, the local welfare agency…must inform the alleged offender of the complaints or allegations made against the individual in a manner consistent with laws protecting the rights of the person who made the report."

297.    Neither Defendant Cahlin, nor any other Mahnomen County CPS employee or supervisor, provided Plaintiffs with adequate notice of the complaints or allegations against them before entering a maltreatment finding against them.

298.    Defendants informing Plaintiffs they "may have sexually abused" R.M. and S.M.—with no specificity regarding what Plaintiffs were alleged to have done and/or when and where the alleged abuse took place—is insufficient statutory notice for Plaintiffs to respond and defend themselves against incredibly serious allegations.

299.    Under Minn. Stat. § 260E.20, subd. 3(b), the local welfare agency conducting an investigation "*shall* collect available and relevant information to ascertain whether maltreatment occurred and whether protective services are needed." (emphasis added).

300.    Minn. Stat. § 260E.20, subd. 3(c) defines relevant information to be collected to include, *inter alia*, information about the alleged offender, the nature of the reporter's

relationship to the child and to the alleged offender, and "other collateral sources having relevant information related to the alleged maltreatment."

301.    Minn. Stat. § 260E.20, subd. 3(d) reiterates that "[i]nformation relevant to the assessment or investigation *must* be asked for" (emphasis added), and may include: prior reports of maltreatment, including any maltreatment reports that were screened out and not accepted for assessment or investigation; credibility of the child's statement; a medical examination or prior medical records relating to the child; and interviews with the child's caretakers, including parents, guardians, family members, child care providers, and other persons who may have knowledge regarding the alleged maltreatment and the care of the child.

302.    Cahlin's investigation falls woefully short of the mandatory investigation and information collection procedures outlined in Minn. Stat. § 260E.20, subd. 3.

303.    Cahlin failed to collect relevant and available information to ascertain whether the maltreatment occurred.  She refused to even speak with either of the alleged perpetrators, who were also family members and caregivers with helpful knowledge about R.M. and S.M.

304.    Cahlin refused to interview and collect information from important collateral sources, such as Howard and Paulette Thorson, who are the children's grandparents, caregivers, and in whose house the abuse was alleged to have taken place.

305.    Howard and Paulette Thorson reached out to Cahlin to provide information, and Cahlin never attempted to contact them.

306.    Cahlin never sought medical records or physical examinations of R.M. and/or S.M.

307.    Cahlin did not collect information about R.M.'s learning challenges and diagnoses with processing disorder and anxiety disorders, which might affect his interview and disclosures.

308.    Cahlin did not collect relevant information related to Scott's prior false accusations of child sex abuse lodged against Plaintiffs, including multiple prior maltreatment reports and police reports that were found to be unsubstantiated.

309.    Cahlin's "investigation" violated Minnesota state law, agency procedure, and Plaintiffs' rights to be notified and heard before Cahlin entered serious and devastating child maltreatment allegations against them.

## DEFENDANT  JULIE HANSON ACTS AS A RUBBER STAMP IN THE NOMINAL RECONSIDERATION PROCESS

310.    Plaintiffs timely sought reconsideration of the decisions against them.

311.    Instead of critically evaluating the unlawful investigation, Defendants doubled down on the unsupported findings against Plaintiffs.

312.    Even after the findings had been entered, Cahlin noted in the case management system on January 9, 2023, that she was texting with Scott about how the rest of winter break went.

313.    Importantly, on January 10, 2023, the North Dakota State's Attorney's Office declined to prosecute Plaintiffs for child abuse based on the information provided by Mahnomen County CPS.

314. The State's Attorney's Office outlined several issues with the case in the decline letter, all of which Defendants were aware of and should have taken into consideration in their own investigation process.

315. Per the State's Attorney's Office, the State could not prove any charge against Plaintiffs where only *one* of the children disclosed abuse during the forensic interview; the children were previously interviewed and neither disclosed; the parents of the children are currently going through a divorce; and the manner in which the child disclosed and both of the children's vocabulary "presents issues."

316. Defendants refused to take the State's Attorney's Office letter as a wakeup call about the problematic nature of their investigation and the weakness of their findings against Plaintiffs.

317. Defendant Julie Hanson, Cahlin's supervisor and the Mahnomen County Human Services Director, participated in the reconsideration process.

318. Rather than a guardrail, Hanson merely served as a rubber stamp.

319. Hanson received and reviewed Plaintiffs' requests for reconsideration and was therefore apprised of the alarming issues with Cahlin's "investigation."

320. Hanson was aware that state law required face-to-face interviews of Plaintiffs, which Cahlin had not conducted.

321. Hanson emailed Amy's attorney on January 18, 2023, stating Defendants "would be willing to consider" Amy's request for an interview.

322. Interviewing the subjects of a child maltreatment investigation is not discretionary, nor is Amy required to request that Defendants obey state law.

323.    As Amy's attorney rightly pointed out, an after-the-fact interview would not cure the Defendants' failure to observe the proper pre-determination process.

324.    Amy's attorney requested that Defendants vacate the maltreatment finding in order to complete the required pre-determination process, including interviewing Plaintiffs.

325.    Rather than accept this reasonable proposal, and correct Defendants' own errors, Hanson accused Amy of refusing to be interviewed during the investigation.

326.    According to Hanson, Amy "was offered the opportunity, on more than one occasion, to be interviewed and declined to schedule or participate in an interview. That would be considered a refusal."

327.    This was entirely fabricated. Amy at *no point* refused to be interviewed prior to the maltreatment determination. To the contrary, Amy requested that Cahlin schedule an interview though her attorney.

328.    When Amy's attorney later reached out to follow-up on Amy's request, Cahlin claimed that she did not need to speak with Amy before entering her maltreatment finding.

329.    Nothing about Amy's unilateral attempts to force Cahlin to comply with state law and conduct an interview can remotely be construed as a "refusal."

330.    It was Cahlin who refused to interview Amy before reaching a finding.

331.    Despite Defendants' refusal to acknowledge the shortcomings in their investigation process, Amy submitted to an interview on February 2, 2023.

332.    Predictably, Cahlin's interview was abrasive and unproductive.

333.    Cahlin was rude to Amy during the interview. She took an accusatory approach and referred to Amy as an offender, abuser, and/or perpetrator throughout the conversation.

334.    Cahlin interrogated Amy about her past treatment for alcohol abuse and erroneously claimed Amy did not complete her substance abuse treatment programs.

335.    Still, Amy was able to explain that in her home, the boys call private parts "weewee," whereas Scott and the children's older half-brother use foul language like "dicks" and "wieners" in the home.  The older brother is exposed to explicit language from watching YouTube and playing video games.

336.    Scott uses vulgar language and does not censor himself around the children.

337.    The use of age-inappropriate language like "sucking dick" indicates coaching.

338.    Karley, through her attorney, requested a different interviewer based on her discomfort with Cahlin's relationship to Scott and Cahlin's behavior during the investigation.

339.    Indeed, why would Karley submit to an interview with Cahlin, who had already told her that an interview would not change the determination against her?

340.    But Hanson refused to provide Karley with a different interviewer than Cahlin.

341.    Still, Karley sat for an interview with Cahlin on February 3, 2023.  Karley described her loving relationship with her nephews, and the support she had provided them over the years.

342.    She described the strategies she uses to redirect misbehavior—tools she has developed over her years as a licensed teacher, daycare provider, and volunteer.

343.    Just like Amy, Karley explained that Plaintiffs use "weewee" to refer to private parts, whereas Scott has introduced the boys to bad language—"butthole," "poop stain," "dick"—from his own vocabulary and inappropriate videos.

344.    Karley expressed her belief that Scott coached the boys to report sex abuse based on his previous false allegations and the deteriorating relationship between Scott and the Thorsons.

345.    Defendants refused to budge.  No real reconsideration took place.

346.    Despite the Plaintiffs' interviews, submission of additional documents, and multiple communications from their attorneys, Hanson shockingly claimed that "no new or different information [was] provided.  No reason to change determination" in a February 3, 2023, case management note.

347.    Defendants upheld the maltreatment findings on February 6, 2023, in letters signed by Defendant Hanson.

348.    Hanson's letters regurgitated the same lie as the previous maltreatment findings, namely, that both R.M. and S.M. had disclosed abuse during their forensic interviews.

## PLAINTIFFS ARE VINDICATED ON APPEAL

349.    On March 6, 2023, Amy and Karley Thorson both appealed the child maltreatment findings entered by Defendants Cahlin and Hanson on behalf of Mahnomen County to the Minnesota Department of Human Services Appeal Division.

350.    The first set of eyes outside Mahnomen County reversed Defendants' maltreatment findings, for substantially similar reasons as to both Amy and Karley.

351.    Karley's appeal proceeded first before Human Services Judge Wendy Sanchez, while Amy continued fighting her divorce and custody battle against Scott.

352.    Defendant Hanson represented the County and advanced its agenda for purposes of Karley's appeal.

353.    Hanson wrote in the County's closing statement that Cahlin "has been employed at Mahnomen County for the past 3 years and has completed all of her duties, which includes numerous assessment and investigations, with no complaints or disciplinary action for poor performance."

354.    Hanson also falsely accused Karley of hindering Cahlin's investigation by refusing to provide contact information and failing to answer questions.

355.    Following an evidentiary hearing on October 17, 2023, Judge Sanchez reversed the maltreatment finding against Karley Thorson on December 20, 2023.

356.    Cahlin testified at the evidentiary hearing.

357.    She conceded that she had about 10 to 20 conversations with Scott during the investigation, but only one initial phone conversation with Karley before entering her findings.

358.    Cahlin admitted that she did not interview Karley, nor did she attempt to interview or take statements from Howard and Paulette Thorson.

359.    Cahlin knew Karley wanted to provide a statement and told Karley's attorney she would reach out to schedule an interview, but never did so.

360.    Cahlin testified it was a "mistake" to tell Karley's attorney that "[t]he determination [against Karley] stands regardless" of her desire to be interviewed.

361.    Cahlin admitted that if Karley had been interviewed and had a plausible explanation in response to the allegations, "it might have overturned the determination."

362.    Reed also testified and described her interview of R.M. as "chaotic" and "not productive," and R.M.'s behavior as squirrely.

363.    Judge Sanchez concluded there was insufficient evidence in the record to support a finding by the preponderance of the evidence that Karley sexually abused S.M. and R.M.

364.    According to Judge Sanchez, Mahnomen County CPS failed to fully investigate whether maltreatment occurred.

365.    Judge Sanchez found that Cahlin violated Minn. Stat. § 260E.20, subd. 2(b) by failing to conduct a face-to-face interview, or any interview at all, of Karley.

366.    Cahlin also violated Minn. Stat. § 260E.20, subd. 3(a) by failing to collect available and relevant information to ascertain whether maltreatment occurred, which Cahlin could have done by interviewing the children's caregivers, including Karley, Amy, Howard, and Paulette.

367.    Cahlin did not even attempt to contact Howard and Paulette, even though the abuse reportedly took place in their home.

368.    Judge Sanchez was particularly scathing in her treatment of Cahlin's actions and testimony on appeal.  Judge Sanchez gave "very little weight to Cahlin's testimony, given that her testimony was contradictory and untruthful at times."

369.    Despite Cahlin asserting during her testimony that she attempted to interview Karley, "the evidence overwhelmingly shows that is simply not true."

370.   Furthermore, "Cahlin provided answers that were demonstrably defensive, argumentative, and contradictory."

371.   Judge Sanchez likewise panned Mahnomen County CPS for failing to call any witnesses or provide any documentary support for the findings against Karley.

372.   Mahnomen County CPS provided only unauthored and uncertified summaries of the S.M.'s and R.M.'s forensic interviews, rather than the video recordings.

373.   Those summaries reveal significant issues with the disclosures, including that S.M. never disclosed abuse, Reed failed to ask clarifying questions to gather information about the alleged abuse, and inconsistencies and implausibilities about the details of the alleged abuse.

374.   Finally, Mahnomen County CPS failed to provide Karley with adequate notice of the allegations against her and any persuasive evidence to support those allegations, leaving her unable to defend herself.

375.   Co-Chief Human Services Judge Anna I. Cortez adopted Judge Sanchez's Findings of Fact, Conclusions of Law, and Recommended Order as the final decision of the Department of Human Services on December 21, 2023.

376.   Even after Judge Sanchez reversed the finding against Karley, and although all of the same mistakes were made in Defendants' investigation of Amy, Mahnomen County continued to defend Cahlin's actions on appeal in Amy's case.

377.   Defendants knew from the Order in Karley's appeal that the writing was on the wall for the case against Amy, yet refused to act.

378.    Amy's attorney requested that Mahnomen County reverse the finding against her in light of the reversal in Karley's case.  But the County refused and forced Amy to continue in the appeals process, depriving her of even more time with her children.

379.    Unsurprisingly, Amy was also successful in appealing the findings against her.

380.    Amy's case proceeded before Human Services Judge Kathleen McDonough.

381.    After an evidentiary hearing was held on Amy's case on April 26, 2024, Judge McDonough reversed the maltreatment finding on May 14, 2023.

382.    Judge McDonough's decision is similar in reasoning and in its critical tone to Judge Sanchez's decision.

383.    Judge McDonough concluded that Mahnomen County CPS failed to meet its burden to show by a preponderance of the evidence that Amy sexually abused S.M. and R.M.

384.    Cahlin's initial interview of the children at school, of which the agency failed to submit a recording, was leading and assumed sexual abuse occurred.

385.    Judge McDonough expressed concerns about Reed's forensic interviews, including indications the children were coached prior to the interviews, Reed's lack of clarifying questions, and R.M.'s inconsistent disclosures.

386.    Judge McDonough concluded Cahlin's investigation was incomplete and her findings premature.

387.    Like Judge Sanchez, she observed that "Cahlin did not comply with the law" by failing to interview Amy or any collateral sources, like the grandparents, who expressed they had relevant information.

388.    Cahlin reached her determination just 16 days after the maltreatment report, despite having "ample time" to conduct a thorough investigation compliant with Minnesota law.

389.    Cahlin failed to meet or speak with Amy or her attorney prior to issuing her findings, whereas she maintained contact with Scott throughout the investigation.

390.    Relatedly, Judge McDonough also expressed "concerns about a conflict of interest" stemming from the relationship between Scott and Cahlin prior to the investigation.

391.    Cahlin failed to take into consideration as part of her investigation that Amy and Scott were amid a contested divorce and custody battle, even though Minnesota law dictates that the investigator consider the nature of the relationship between the reporter, child, and alleged offender.

392.    The evidence also showed that Scott accused Amy of being a pedophile and demonstrated profound disrespect for Amy in front of the children, which could impact R.M.'s disclosures, as well as indicate manipulation and coaching by Scott.

393.    Despite the evidence that Scot was "extremely hostile" towards Amy, Cahlin refused to consider the possibility that Scott may have coached the children.

394.    Finally, Judge McDonough gave "minimal weight to Cahlin's testimony," which she concluded "was evasive and argumentative."

395.    The Judge had to instruct Cahlin to give direct, rather than evasive, answers.

396.     Cahlin admitted her untruths only after being confronted with contrary evidence.

397.     Cahlin testified that Amy "declined" to be interviewed.  But when confronted with her own testimony under oath in a Cass County family court hearing, Cahlin was forced to admit that Amy's attorney contacted her to schedule an interview.

398.     Quite the opposite, Cahlin told Amy's attorney she did not need to speak with Amy prior to making a maltreatment finding because Amy's statement would not change anything.

399.     Co-Chief Human Services Judge Anna I. Cortez adopted Judge McDonough's Findings of Fact, Conclusions of Law, and Recommended Order as the final decision of the Department of Human Services on May 15, 2024.

## THE DAMAGES

400.     Although Plaintiffs were ultimately successful in appealing Defendants' egregiously wrong maltreatment findings against them, incredible damage to Plaintiffs' family and reputations had already been done.

401.     Plaintiffs were forced to hire attorneys and proceed through a lengthy appeal process that wasted not only their own time and money, but that of Mahnomen County taxpayers.

402.     The entire appeals process could have been avoided had Defendants afforded Plaintiffs due process protections before wrongfully finding they had maltreated their own family members by sexual abuse.

403.    Rather than concede Cahlin's errors, Hanson defended the egregious and unsupported findings on reconsideration and again on appeal.

404.    Family meant everything to Amy and Karley, and Defendant Cahlin's maltreatment finding tore their family apart.

405.    Amy had been the primary parent and, at times, a stay-at-home mom to her children.

406.    She often chose jobs where she would work nights so that she could parent during the day while Scott worked.

407.    Plaintiffs saw R.M., S.M., and F.M. for the last time on November 27, 2022.

408.    Cahlin entered a safety plan on December 14, 2022, on behalf of Mahnomen County recommending Amy, Karley, and their relatives have no contact with the children, in person or via electronic communication.

409.    Amy did not see her boys, R.M. and S.M., again until May 23, 2024.

410.    Amy spent 543 days—almost a year-and-a-half—without R.M. and S.M.

411.    Amy did not see her daughter, F.M., until June 19, 2024.

412.    Amy missed holidays, birthdays, and countless milestones in her children's lives that she can never replace.

413.    It was an incredibly dark and challenging time for Amy.  She did not know if she could survive without her kids.

414.     Amy lost her job as a Personal Care Assistant (PCA) for Accra Home Care when the agency did an annual background check and discovered the child maltreatment finding.

415.     Through it all, Amy continued to fight the false maltreatment finding against her.

416.     Amy also maintained her sobriety so that her children would have a safe and stable home to return to.

417.     On June 19, 2024, Scott voluntarily returned the children to Amy's care.

418.     However, Amy is still in the process of seeking legal custody over her children.

419.     Amy lives in fear that her kids will be taken away again.

420.     Amy is also concerned that the separation traumatized R.M. and S.M.  R.M. suffers from adjustment disorder with anxiety, general anxiety disorder, and a stress-related disorder. S.M. has been diagnosed with Attention Deficient/Hyperactivity Disorder (ADHD), disruptive mood dysregulation disorder, adjustment disorder, and oppositional defiant disorder (ODD).  F.M. also suffers from adjustment disorder.

421.     Amy also now suffers from Obsessive-Compulsive Disorder (OCD) and depression.

422.     Amy and her children are all in counseling to cope with the mental health effects of the forced separation Defendants caused.

423.     Karley was likewise separated from her niece and nephews for a year and a half.

424.     Karley was like a second mom to the kids, and she missed them daily.

425.     As a licensed elementary school teacher, Karley had also provided significant tutoring and school assistance to the boys and worried that they would fall behind at a new school in solely Scott's care.

426.     Defendants' false maltreatment finding against Karley also affected her status and reputation as a teacher in West Fargo Public Schools.

427.     Karley had an unblemished record and glowing reputation before Defendants entered a child maltreatment finding against her.

428.     After  Cahlin entered the maltreatment finding against Karley, she affirmatively reached out to the teaching licensing agencies in North Dakota and Minnesota to inform them she made a child sex abuse finding against Karley.

429.     On January 14, 2023, before Karley even had the opportunity to seek reconsideration of Cahlin's decision, the Education Standards and Practices Board (ESPB) of North Dakota placed Karley's teaching license under review.

430.     The ESPB publicly discussed the Mahnomen County maltreatment finding against Karley during its January 12, 2023, and February 9, 2023, board meetings.

431.     At the January 12, 2023, board meeting, the Board unanimously voted to issue a settlement agreement to suspend Karley's teaching license.  The Board discussed whether there would be a criminal case against Karley.

432.     The Board also voted to issue a Request for Inquiry into Karley's teaching license.

433.    Although Karley ultimately kept her license, the stigma and reputational harm remain.

434.    The minutes from the ESPB meetings, which include Karley's full name and a discussion of the maltreatment finding against her, come up at the top of a Google.com search of Karley's name.

435.    Karley's colleagues, school administrators, and any potential future employers can easily view this information, causing Karley continued humiliation and reputational harm as a public-school employee.

436.    On January 18, 2023, the Minnesota Professional Educator Licensing and Standards Board (PELSB) likewise notified Karley it had initiated an inquiry into her teaching license in Minnesota.

437.    The PELSB threatened to take action against Karley's teaching license, including suspending or revoking the license if the allegations were substantiated.  Defendants had already substantiated the allegations by entering a finding of child sex abuse against her.

438.    The PELSB held the complaint against Karley open throughout her appeal and even after the findings were reversed until the window for the agency to appeal Judge Sanchez's decision closed.

439.    The complaint was not dismissed until January 24, 2024, over a year after Defendants entered a maltreatment finding against Karley.

440.    Karley suffered ongoing fear and anxiety as the status of her Minnesota teaching license remained in limbo.

441.    Members of West Fargo Public Schools, including teachers and administrators from Karley's school, were aware of the maltreatment finding against her, further stigmatizing her reputation, honor, and good name as a teacher.

442.    Defendants' maltreatment finding is a permanent mar on Karley's reputation as an educator and childcare provider.  Karley fears she will be denied opportunities to volunteer and engage in community service with children in the future.

443.    Teaching has been Karley's dream since she was a child, and Defendants put her career and vocation at risk.

444.    Karley suffers from stress and anxiety from the experience of having to defend herself against Defendants' false finding that she sexually abused her nephews.

**COUNT ONE**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**PROCEDURAL DUE PROCESS VIOLATION**
***Plaintiff Amy Thorson v. Defendant Cristie Cahlin***

445.    Plaintiff Amy Thorson realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

446.    The Fourteenth Amendment prohibits the government from depriving a person of life, liberty, or property without the due process of law. *See* U.S. Const. amend. XIV, § 1.

447.    Plaintiff Amy Thorson has a constitutionally protected liberty interest in the care, custody, and management of her minor children. *See Swipies v. Kofka*, 419 F.3d 709, 713 (8th Cir. 2005).

448.     Plaintiff Amy Thorson had a due process right to be given notice and a meaningful opportunity to be heard before Defendant Cristie Cahlin found she committed maltreatment of a child by sexual abuse. *See Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976).

449.     Defendant Cahlin, acting under color of state law as a Mahnomen County CPS investigator, deprived Amy of her protected due process right when she determined that Amy sexually abused her children and entered a maltreatment finding against her without constitutionally adequate procedural safeguards. *See Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982).

450.     A mother's interest in the custody of, and time spent with, her children is of paramount importance. Being separated from her children was excruciating for Amy.

451.     Defendant Cahlin disregarded procedural safeguards and denied Amy any meaningful opportunity to be heard when she refused to interview Amy, take her statement, or observe basic child abuse investigation procedures before making a child maltreatment finding against her.

452.     The risk of an erroneous deprivation of Amy's parenting rights was incredibly high given the procedures Cahlin adopted and, more importantly, those she refused to adopt.

453.     There was a known and obvious risk of making an erroneous maltreatment finding when Cahlin refused to interview key witnesses, including the alleged perpetrators of the abuse and the grandparents in whose house the abuse was alleged to take place.

454.    The probable value of additional procedural safeguards, including giving Plaintiffs an opportunity to be heard and defend themselves and speaking to other crucial witnesses such as Paulette and Howard Thorson, is high.

455.    State law requires such safeguards expressly to avoid erroneous deprivations of parenting rights.

456.    The additional procedural safeguards would not hamper the County's function nor pose a fiscal or administrative burden on the County. The County already provides for such safeguards, and Cahlin violated the County's protocols and state law by refusing to take a statement from the alleged perpetrator, collect available evidence, interview key witnesses, and ignoring evidence contrary to her child maltreatment finding.

457.    Punitive damages are available against Defendant Cahlin and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30, 35 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

458.    Plaintiff is entitled to recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

<u>**COUNT TWO**</u>
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**PROCEDURAL DUE PROCESS VIOLATION**
***Plaintiff Karley Thorson v. Defendant Cristie Cahlin***

459.    Plaintiff Karley Thorson realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

460. The Fourteenth Amendment prohibits the government from depriving a person of life, liberty, or property without the due process of law. *See* U.S. Const. amend. XIV, § 1.

461. Plaintiff Karley Thorson has a constitutionally protected liberty and property interest in her employment as a public-school teacher by West Fargo Public Schools in West Fargo, North Dakota.

462. Defendant Cahlin, acting under color of state law as a Mahnomen County CPS investigator, deprived Karley of a constitutionally protected liberty interest when Cahlin entered an unsupported and unjustified child maltreatment finding against her, stigmatizing her reputation, honor, and good name as a teacher in West Fargo public schools. *See Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994).

463. Defendant Cahlin publicized her false maltreatment finding against Karley to the Education Standards and Practices Board of North Dakota and the Minnesota Professional Educator Licensing and Standards Board, the teaching licensing agencies in North Dakota and Minnesota, respectively.

464. Defendant Cahlin's false and unsupported maltreatment finding prompted the Minnesota PELSB and the North Dakota ESPB to place Karley's license under review, placing her teaching license and employment at risk.

465. The ESPB unanimously voted to issue a settlement agreement to suspend Karley's teaching license and issued a Request for Inquiry into the allegations against Karley.

466. The ESPB meeting minutes from January 12, 2023 and February 9, 2023, which include Karley's name and discussions of the Mahnomen County maltreatment finding, come

up at the top of a Google.com search of Karley's name, causing her further humiliation and reputational harm as a teacher. Any future school employer has access to these minutes.

467.    Members of West Fargo Public Schools and teachers and administrators from Karley's school also became aware of the maltreatment finding against her, further stigmatizing her reputation, honor, and good name as a teacher in West Fargo public schools.

468.    Upon information and belief, the reviews completed by the ESPB and PELSB are a part of Karley's permanent employment file with West Fargo Public Schools.

469.    Cahlin's child maltreatment finding and her dissemination thereof implicates Karley's liberty interest because the accusation is "so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges." *Winegar*, 20 F.3d at 899.

470.    Karley had a due process right to be given notice and a meaningful opportunity to be heard before Mahnomen County found she maltreated a child by sexual abuse. *See Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976).

471.    Cahlin deprived Karley of that right when she found Karley maltreated a child by sexual abuse without affording her constitutionally adequate procedural safeguards.

472.    Cahlin disregarded the Mahnomen County's procedural safeguards and denied Karley any meaningful opportunity to be heard when she refused to interview

Karley or take her statement before making a damaging child maltreatment finding against her.

473.    The risk of an erroneous deprivation of Karley's protected interest in her employment, reputation, honor, and good name as a public-school teacher was incredibly high in light of the procedures Defendant Cahlin adopted and refused to adopt.

474.    There was a known and obvious risk of making an erroneous maltreatment finding when Cahlin refused to interview key witnesses, including the alleged perpetrators of the abuse and the grandparents in whose house the abuse was alleged to take place.

475.    The probable value of additional procedural safeguards, including giving Plaintiffs an opportunity to be heard and defend themselves and speaking to other crucial witnesses such as Paulette and Howard Thorson, is high. State law requires such safeguards expressly to avoid erroneous deprivations of parenting rights.

476.    The additional procedural safeguards would not hamper the County's function nor pose a fiscal or administrative burden on the County. The County already provides for such safeguards because they are mandated by state law, and Defendant Cahlin violated state law and the County's protocols by refusing to take a statement from the alleged perpetrator, declining to interview key witnessed, refusing to collect relevant and available evidence, and ignoring evidence contrary to her child maltreatment finding.

477.    Cahlin intended that the licensing agencies would take action against Karley's license when she informed them of the child maltreatment finding, and therefore proximately caused a deprivation of Karley's protected interest in her public-school employment.

478.    Punitive damages are available against Defendant Cahlin and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30, 35 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

479.    Plaintiff is entitled to recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT THREE
### 42 U.S.C. § 1983
### FOURTEENTH AMENDMENT
### PROCEDURAL DUE PROCESS VIOLATION
### *Plaintiffs Amy & Karley Thorson v. Defendant Julie Hanson*

480.    Plaintiffs reallege each of the preceding paragraphs as if fully stated herein.

481.    Defendant Julie Hanson was at all times material herein acting under color of law as the Social Services Director of Mahnomen County Social Services and a supervisory employee who oversaw Defendant Cahlin's work and training as a Mahnomen County CPS investigator.

482.    Upon information and belief, under color of state law, Defendant Hanson directly participated in the violation of Plaintiffs' constitutional rights when she inserted herself in the reconsideration process after Cahlin entered the initial maltreatment findings.

483.    Defendant Hanson had actual knowledge of Defendant Cahlin's inadequate investigation of the maltreatment allegations against Plaintiffs.

484.    Defendant Hanson ratified Defendant Cahlin's intentional denial of notice and an opportunity to be heard by denying Plaintiffs' requests for

reconsideration, despite her awareness of the constitutionally flawed investigation process, in violation of the Fourteenth Amendment to the United States Constitution.

485.    Defendant Hanson falsely claimed that Plaintiffs refused or declined to be interviewed, even after their attorneys clarified that Plaintiffs were ready and willing to be interviewed throughout the investigation.

486.    As a direct and proximate result of the acts and omissions by Defendant Hanson, Plaintiffs suffered separation from their minor children and/or nephews, humiliation, reputational harm, and severe mental distress and anguish.

487.    Hanson subjected Plaintiffs to this deprivation of their rights either maliciously or by acting with reckless disregard for whether Plaintiffs' rights would be violated.

488.    Punitive damages are available against Defendant Hanson and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30, 35 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

489.    Plaintiffs are entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, pray for judgment against Defendants as follows:

1.    That this Court find that the Defendants committed acts and omissions constituting violations of the Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.      As to Count I, a money judgment against Cristie Cahlin for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against Cristie Cahlin for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Julie Hanson for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

5.      For such other and further relief as this Court may deem just and equitable.


Dated:  September 19, 2024                    **ROBINS KAPLAN LLP**

                                             s/Andrew J. Noel
                                             Robert Bennett, #6713
                                             Andrew J. Noel, #322118
                                             Kathryn H. Bennett, #0392087
                                             Marc E. Betinsky, #0388414
                                             Greta A. Wiessner, #0401130
                                             Julie C. Moroney, #0504300
                                             800 LaSalle Ave, Suite 2800
                                             Minneapolis, MN 55402
                                             Telephone:  612-349-8500
                                             rbennett@robinskaplan.com
                                             anoel@robinskaplan.com
                                             kbennett@robinskaplan.com
                                             mbetinsky@robinskaplan.com
                                             gwiessner@robinskaplan.com
                                             jmoroney@robinskaplan.com

                                                 -   and -

**RINGSTROM DEKREY**
Dane DeKrey, #0397334
814 Center Ave., Suite 5
Moorhead, MN 56560
Telephone: 284-0484
dane@ringstromdekrey.com

***Attorneys for Plaintiffs Amy Thorson and Karley Thorson***